**Patrick E. Mahoney, ISB #5242**
**MAHONEY LAW, PLLC**
THE VELTEX BUILDING
420 W. Main Street, Suite 206
Boise, Idaho 83702
Telephone:  (208) 345-6364
Facsimile:  (208) 336-2088
patrick@patrickmahoneylaw.com

**Jeffrey McKinnie, ISB #7020**
MCKINNIE LAW OFFICE
P.O. Box 9469
Boise, Idaho 83707
Telephone (208) 429-0088
Fax (208) 336-2088
jeffmckinnie@hotmail.com

**Attorneys for the Plaintiffs**


# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO


| | |
|---|---|
| C.K.S., a minor, by and through his biological parents, Jazmin Sierra and Kevin L. Swan, and JAZMIN SIERRA and KEVIN L. SWAN, individually and as husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT** |


COME NOW, the above captioned Plaintiffs, by and through their attorneys of record,

Mahoney Law, PLLC, and McKinnie Law Office, and for their Complaint against the Defendant

captioned above, state and allege as follows:

COMPLAINT - Page 1

**PARTIES, JURISDICTION, AND VENUE**

1.       This is a case of medical negligence brought by Plaintiff C.K.S., a minor, by and through his biological parents, Jazmin Sierra and Clifton K. Swan (husband and wife).  Jazmin Sierra and Clifton K. Swan also hereby sue in their individual capacities.  Plaintiffs were and are residents of Nampa, Canyon County, Idaho.

2.       Defendant United States of America is sued under the Federal Tort Claims Act as the representative Defendant and real party in interest for Terry Reilly Health Services (a d/b/a for Community Health Services, Inc., "Terry Reilly"), Julia Barcelo, P.A., and Dr. William Laitinen, M.D., both of whom were, at all times relevant hereto, employees and/or contractors for Terry Reilly Health Services and both Idaho licensed healthcare providers, and, all of whom are covered by §224(h) of the Public Health Services Act (a/k/a the Federally Supported Health Centers Assistant Act of 1992), 42 U.S.C. §233(g)-(n), and all of whom are therefore covered by the Federal Tort Claims Act and the regulations promulgated thereunder by the U.S. Department of Health and Human Services.  Under the laws of the State of Idaho, a private person would be liable in this case for the actions and omissions of Terry Reilly Health Services and said aforementioned individual healthcare providers; therefore, pursuant to the Federal Tort Claims Act, including, without limitation, 28 USC §2674, *et seq*., and pursuant to 28 U.S.C. §1346(b), the United States of America is liable to the Plaintiffs for their damages as set forth herein.

3.       Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1346(b)(1).  This action involves a claim against the United States, for money damages, for personal injury caused by the negligent and/or wrongful act or omission of employees of the government while acting within the scope of their office or employment.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

COMPLAINT - Page 2

4. Venue is proper pursuant to 28 U.S.C. §1402(b) and 28 U.S.C. §1391(e)(1) as a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

5. Plaintiffs timely presented this claim in writing to the Department of Health & Human Services claims office.  The Department of Health & Human Services failed to make a final disposition of the claim within six months after it was presented pursuant to 28 U.S.C. §2675(a).

## FACTS AND GENERAL ALLEGATIONS

6. The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

7. Baby C.K.S, male, age 1 year and 7 months, suffered severe and irreversible, yet preventable, brain injury due to the negligence and recklessness of the Defendant.

8. Jazmin Sierra ("Jazmin") reported to Terry Reilly in Nampa, Idaho on January 1, 2012.  She was 19 years old at the time.  She was pregnant, was found to be in good health, was determined to not have any unusual prenatal risk factors, and was scheduled for routine prenatal care.  She was prescribed routine prenatal vitamins (which she took appropriately throughout her prenatal course).  She made her regularly scheduled pre-natal visits to Terry Reilly in Nampa. Fetal ultrasound at 22 weeks was normal, fetal heart rate was normal, and there was normal fetal movement reported.

9. Generally speaking, a pregnant mother's fundal height in centimeters should be the same as the gestational age of the fetus, measured in weeks.  Serial fundal height measurements are how fetal growth is tracked.  As of June 29th, 2012, Jazmin's fundal height began slightly lagging, when estimated gestational age (EGA) was at 31 5/7 weeks and fundal

COMPLAINT - Page 3

height was 31. On July 12, 2012, EGA was 33 4/7, and fundal height continued to very slightly lag, measured at 33. On July 18, 2012, however, EGA was 34 3/7, and fundal height was 29, a discrepancy of over 5 cm. Jazmin manifested a weight loss of 3.4 pounds since her last visit. These factors meant that the fetus was at risk for intrauterine growth restriction. As of this visit to Terry Reilly, Jaszmin was under the care of Julia Barcelo, P.A., as her primary doctor was out of town.

10. As of July 18, 2012, the Terry Reilly providers, including Julia Barcelo, P.A., failed, in violation of the applicable standard of healthcare practice, to obtain an obstetrical or perinatology consult. The Terry Reilly providers, including Julia Barcelo, P.A. failed, in violation of the applicable standard of healthcare practice, to order increased fetal testing (such as sonogram testing, biophysical profile testing, amniotic fluid volume testing, and Doppler assessment of fetal circulation), all despite Jazmin's risk for placental insufficiency, intrauterine growth restriction, and other potential adverse outcomes for the baby. The Terry Reilly providers, including Julia Barcelo, P.A., failed to classify the pregnancy as high risk, in violation of the applicable standard of healthcare practice.

11. As of July 18, 2012, in violation of the applicable standard of healthcare practice, there was no consideration given by the Terry Reilly providers, including Julia Barcelo, P.A., to delivering the baby at this time, despite the fact that the pregnancy was now 34+ weeks. It is well understood that the risk of problems to babies born by cesarean section for possible intrauterine growth restriction at 34 weeks far outweighs the increased risk of allowing the pregnancy to continue further with placental insufficiency. A timely diagnosis intrauterine growth restriction (IUGR) as a fetus approaches term, as in this case, is an indication for delivery. And, if maternal medical conditions are thought to be the cause of IUGR, delivery is

the management that can affect the outcome.  In this regard, a concerted effort needed to have been made to determine the underlying cause of the IUGR, which was not done in this case in violation of the applicable standard of healthcare practice.  In this case, there was no benefit to continued in utero development in light of the risks of the continued placental insufficiency. Prompt delivery is best for a fetus at or near term who is considered growth restricted.  Delivery should be performed at 34 weeks or beyond, particularly if there is clinically significant oligohydraminous, as the mother in this case was ultimately determined to have.  But again, no obstetrical or perinatology consult was obtained for this purpose, in violation of the applicable standard of healthcare practice by the Terry Reilly providers, including Julia Barcelo, P.A.

12.    On July 23, 2012, EGA was 35 1/7 weeks, fundal height was 30, a continued discrepancy of over 5 cm.  Again, for a second time, no obstetrical or perinatology consult was ordered by the Terry Reilly providers, in violation of the applicable standard of healthcare practice, including by Julia Barcelo, P.A.  Additionally, lab results for this visit showed a concerning level of protenuria, with a protein creatinine ratio of 3651.5 mg/G.  Again, no consult with a specialist was ordered and delivery was not considered despite evidence of IUGR with preeclampsia, in violation of the applicable standard of healthcare practice, including by Julia Barcelo, P.A.  And, it was only then, that PA Barcelo began the process of merely scheduling an ultrasound.  The Terry Reilly providers, including Julia Barcelo, P.A., failed, in violation of the applicable standard of healthcare practice, to obtain an appropriate obstetrical and/or perinatology consult despite continued significantly abnormal fundal height measurements and abnormal protein to creatinine ratio at 35 weeks.  As such, timely delivery by cesarean section was not even considered let alone performed in this IUGR situation, in violation of the applicable standard of healthcare practice.

13.      Jazmin reported to St. Alphonsus hospital in Nampa on July 25th, 2012, at approximately 6:15 p.m.  She was not feeling well and was experiencing contractions.  She was also noted to have severely high blood pressure.  A labor and delivery nurse flow-sheet was started at 7:36 p.m. that evening.  At 7:50 p.m., the nurse's notes document that Dr. William Laitinen M.D. ("Dr. Laitinen"), the Terry Reilly doctor on-call, was notified.  He gave orders for IV fluids.  There is no evidence that Dr. Laitinen reviewed the mother's history at Terry Reilly, such that he was unaware of the documented growth problems in terms of continued clinically abnormal fundal height measurements, which failure was in violation of the applicable standard of healthcare practice.  At 7:59 p.m., the nurses note document that Dr. Laitinen was notified of concerns as to the patient's blood pressure, 3+ urine protein, and history of 2+ urine protein.   At 8:50 p.m., nursing again notified Dr. Laitinen of blood pressure as well as fetal heart rate concerns.  At 9:18 p.m., the strip showed absent variability.  Hydralazine was ordered and given.  At 9:37 p.m., the nurse notes reflect absent variability and then minimal variability.  Dr. Laitinen reviewed the strip at 9:36 p.m.  The strip still showed absent variability, which had persisted now for 20 minutes.  By 10 p.m., the strip still showed absent variability, with decelerations.  Dr. Laitinen reviewed the strip at 10:11 p.m., and the strip was still showing absent variability with decelerations.  At this point, there had been absent variability with interspersed decelerations (and no assuring accelerations, let alone 15x15 accelerations) for an hour.  At 10:36, Dr. Laitinen reviewed the strip again, and the absent variability with decelerations had continued uncorrected.  This continued through 10:50 p.m., when a pattern of terminal bradycardia was manifested.

14.      Despite Dr. Laitinen being aware of fetal distress shown on the monitoring strip, and despite the fetal growth problems documented in the weeks prior at the clinic, Dr. Laitinen did not call for an obstetrical consult until the non-reassuring strip had persisted for over an hour,

in violation of the applicable standard of healthcare practice.  Dr. Laitinen was not cesarean section privileged, so a very prompt and timely obstetrical consult was required given that he knew, or should have known, that an obstetrician would have to be called in from home.  Calling for a timely obstetrical consult was, in fact, part of Dr. Laitinen's privileging requirements as a family physician with the hospital where the labor was occurring.  The records of the obstetrician who finally performed an emergency cesarean section, Dr. Lynn, show that he did not receive a call from Dr. Laitinen until 10:20 p.m.  Dr. Lynn, who was home at the time, reviewed the baby's fetal heart rate monitoring strip in its entirety by remote computer access.  He determined that the stip showed absent variability with decelerations.  Dr. Lynn immediately ordered a stat cesarean section. Dr. Lynn arrived at the hospital at 10:57 p.m. according to the nursing notes.  Of significance is the fact that the very same pattern on the strip that prompted the emergency cesarean section had persisted for nearly two hours before the emergency delivery, during which time Dr. Laitinen failed to call for the required obstetrical consult in violation of the applicable standard of healthcare practice.  Also of significance is the fact that the non-reassuring fetal heart rate in the face of the previously documented fetal growth problems only compounded the situation and made it all the more urgent.  In an IUGR situation, a clinician in the position of Dr. Laitinen should proceed to cesarean delivery (via obstetrical consult in this case) if there is any evidence of deteriorating fetal status during labor, which he failed to do in violation of the applicable standard of healthcare practice.

15.     Baby C.K.S. was finally born by emergency cesarean section, performed by Dr. Lynn, on July 25th at 11:14 p.m., with the primary indication being non-reassuring fetal status. His APGARs at 1 min, 5 min, and 10 min, respectively, were 1, 1, and 2.  His birth weight was 4 lbs, 1 oz., with a gestational age at delivery of 36 weeks.  His cord arterial blood gas reflected a

COMPLAINT - Page 7

pH of 6.990 and venous cord blood gas was 6.81 (both severely acidotic).  Full resuscitation was required (chest compressions, bagging, intubation).  He was transferred to the NICU at St. Alphonsus Regional Medical Center in Boise, Idaho.

16.     The Saint Alphonsus hospital records for baby C.K.S. after delivery show that he suffered severe birth depression and acidosis.  He had intracranial hemorrhage and subsequent liver dysfunction and renal failure, described by the treating pediatric neurologist as multiple organ failure.  He was diagnosed as having suffered hypoxic-ischemic encephalopathy from perinatal hypoxia.  His APGAR scores and cord blood gas were confirmatory of this.  Baby C.K.S. manifested overt clinical seizures with abnormal electroencephalogram consistent with significant brain injury.  The pediatric neurologist documented in his records that the markedly abnormal neonatal electroencephalogram was "ominous regarding neurological prognosis." Baby C.K.S. was put on Phenobarbital for seizure control.  Baby C.K.S. was on a ventilator at the hospital for respiratory failure and he was administered therapeutic brain cooling.  With a stated indication of birth asphyxia, MRI of the brain done on August 10, 2012 showed right cortical/subcortical temporal hemorrhage.  Baby C.K.S. was in intensive care until August 24, 2012.  The treating pediatric neurologist subsequently confirmed the diagnosis of hypoxic ischemic encephalopathy on follow up exam conducted on September 25, 2012.

17. Terry Reilly failed to enact, disseminate, monitor, and enforce appropriate policies and procedures, and failed to adequately train and supervise its physicians assistants and family practitioners as to the same, specifically, without limitation, as to fundal height measurements, IUGR, fetal distress, and cesarean section, in addition to patient advocacy, chain of command, fetal assessment during labor and delivery, fetal heart rate monitoring, physician communication, charting, caesarean sections, labor and delivery complications, and obstetrical consults.

COMPLAINT - Page 8

18.     As a direct and proximate result of the aforementioned violations of the applicable standards of healthcare practice, baby C.K.S. suffered severe yet preventable birth asphyxia and hypoxic ischemic encephalopathy, and permanent brain damage, resulting in serious developmental delays.  He will require lifetime care and will never be normal.

## MEDICAL NEGLIGENCE

19.     The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

20.     The medical care described above on the part of Terry Reilly, Julia Barcelo, P.A., and Dr. Laitinen, was negligent, reckless, grossly negligent, and failed to meet the applicable standards of care for labor and for delivery of a baby under the circumstances in Nampa, Idaho as of the time of the care in this case.

21.      The medical negligence on the part of the Defendant was a direct and proximate cause of, and a substantial factor in causing, injury and damages suffered by Plaintiff C.K.S. including, without limitation, brain injury, substantial medical bills, therapy bills, home care expenses, and other expenses incurred incident to the life care and treatment of Plaintiff C.K.S., as well as pain, suffering, disfigurement, mental anguish, and loss of enjoyment of life on the part of C.K.S., past, present, and future.  Plaintiffs Jazmin Sierra and Kevin L. Swan have themselves suffered and will suffer in the future mental pain and suffering, anguish, and loss of companionship of their son, as a direct and proximate result of the Defendant's violations of the applicable standards of healthcare practice.  As such, Plaintiffs are entitled to an award of damages for all allowable general and special damages, in an amount to be proven at trial.

## DEMAND FOR ATTORNEY FEES

22.     The Plaintiffs hereby incorporate and re-allege herein all previous paragraphs of this Complaint.

23.     As a result of the Defendant's conduct complained of herein, the Plaintiffs have been required to retain the services of legal counsel to represent their interests in this matter. Pursuant to Idaho Code §12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable laws, the Defendants are liable to the Plaintiffs for their reasonable attorney fees and litigation costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendant as follows:

a.     A sum adequate to compensate them for all allowable general damages, including, but not limited to, past, present and future physical and mental pain and suffering, anguish, permanent disfigurement and impairment, and loss of enjoyment of life, all in an amount to be determined at trial;

b.     A sum adequate to compensate them for their special damages consisting of, but not necessarily limited to, all past, present, and future medical and related expenses, physical therapy expenses, rehabilitation expenses, travel expenses, and all other life care and incidental expenses, in an amount unknown to the Plaintiffs at this time but which sum shall be more readily ascertained at the trial of this matter;

c.     A sum to compensate them for any past and future loss of income in an amount currently unknown to the Plaintiffs at this time but which sum shall be more readily ascertained at the trial of this matter;

d.     Prejudgment interest to the Plaintiffs;

COMPLAINT - Page 10

e.      Plaintiffs' reasonable attorney fees and costs incurred in the prosecution of this

action, or $10,000 should this matter proceed by default; and

f.      Such other and further relief as this Court deems just and equitable.


**DATED** this 1st day of October, 2013.


                                                MAHONEY LAW, PLLC

                                                By: _____/S/_____

                                                PATRICK E. MAHONEY
                                                Attorney for the Plaintiff